Johnson, J.
In February, 1819, the complainant married Mrs. Hop *6 kins, the relict of Geo. W. Hopkins, who died intestate, and he charges in his bill in substance : — That by a partition of his estate, only one-sixth of the personal estate, being an equal portion with *each of her children, was allotted to the widow, instead of one-third to which she was entitled by law, and deeds executed by her, on the 19th December, 1818, by which, in effect, she confirmed it, and reserving to herself only a life estate in the portion allotted to her, were procured and obtained from her, by the fraud and covin of the defendant Ferdinand Hopkins, Sen., and upon his representation that the property in the negroes, which constituted the bulk of the personal estate, was, in himself, were fraudulent and void as to the widow. But if not, that her deeds, of the 19th December, 1818, were a fraud upon his marital rights, and therefore void.
The answer of Ferdinand Hopkins, Sen., positively and unequivocally repels the allegation of fraud, on his part, and states that during the revolutionary war, his father David Hopkins, gave to himself and his brother Newton Hopkins, the stock from which these negroes descended, in trust that they would divide them equally between themselves, and their brother G. W. Hopkins the intestate, and a sister, Mary; which had been done to the entire satisfaction of all parties. That the intestate took the exclusive possession of those allotted to him, in 1798 or ’9, and continued in possession of them, up to the time of his death, and that they remained in possession of his widow up to the time of the partition, and that he never had at any time, pretended any claim to, or interest in the negroes. In connection with this subject, it appears that the defendant Ferdinand Hopkins, Sen., had by deed dated the 30th December, 1799, conveyed to G. W. Hopkins, his portion of the negroes, given by their father, and upon the partition of his negroes amongst his children and widow, on the 19th December, 1818, he conveyed to each child (with the exception of Mrs. Glenn, who seems to have been forgotten), the portion of these negroes allotted to them, reciting that the title was in himself. This deed was found by the complainant, amongst the papers of G. W. Hopkins, after bill filed. In relation to this matter, he states in his answer that the deed to George W. Hopkins, of 1199, had been forgotten both by himself and the widow, when the deeds of 1818, were executed, and that it was done to avoid any question about his rights. He denies, also, unequivocally, that he exercised any influence over Mrs. Hopkins, to procure her* to execute the deeds of the 19th December 1818, by which reserving a life estate, she relinquishes her interest to her children, and avers that it was done wholly of her own accord.
On the death- of George W. Hopkins, in 1805, his widow and the defendant Ferdinand Hopkins, Sen., administered on his estate ; and in the inventory made by them and returned to the Ordinary’s Office, these negroes are included : and it is also worthy of remark, that in the deeds from Mrs. Hopkins, of the 19th December 1818, written by F. H., Sen. it is recited that the negroes and other property therein contained, are a part of the estate of George W. Hopkins. Thus much I have collected from the documents before me, and I will now proceed to extract from the parol testimony what relates to their questions.
William Hughes a witness for the defendant, stated that before Mrs. Hopkins made the deeds of the 19th December, 1818, she stated in a conversation with him, that “ she intended to convey her property to her *7 children, but wished to reserve a life estate in herselfand he had another conversation with her after the conveyance was executed, but she did not then speak of its particular provisions. Ephraim Lyles, another witness, states that he was twice sent for to write this deed ; upon his going, he advised Mrs. Hopkins “to send for the defendant, Ferdinand Hopkins, Sen. , and when he came, the witness being informed that the right of the property was in him, suggested to him, that he ought to convey it from himself, and that Mrs. Hopkins then executed the deeds to her children.” She- acted, says this witness, against the advice of the defendant, Ferdinand Hopkins, Sen. He advised her, “to hold the staff in her own hands.”
Opposed to this, is the evidence of Mrs. Terry, to whom Mrs. Hopkins stated, about a year before her marriage with the complainant, that the title of these negroes was in the defendant Ferdinand Hopkins, Sen., and that he had frequently “ urged her to make the titles to her own children,” and that they were to be so made. Afterwards she complained that it was a hardship, as she had had so much trouble in raising the negroes, and could not now call one of them her own. Burr Head also states, that shortly after the division of the negroes, *he heard her express much dissatisfaction concerning one which had fallen to her daughter Mrs. Grlenn, which she had raised about the house, and wanted, and Mrs. Grlenn would not exchange with her. But expressed no dissatisfaction about the deeds.
These are the leading facts connected with this question, and they leave in my mind no doubt that the defendant, Ferdinand Hopkins, Sen., acted with perfect fairness in this transaction. The entire absence of any interest on his part, — his never having pretended any claim — his returning them in the inventory, as a part of the estate of Gb W. Hopkins — his advice to Mrs. Hopkins, “to hold the staff in her own hand” — are all utterly inconsistent with a design on his part, to use an improper influence over Mrs. Hopkins, in any disposition she might think proper to make of her interest, in this part of the estate: and his account of his having forgotten the deed to Gb W. Hopkins, made in the partition on the 30th December, 1199, is the only rational solution of the incongruity arising' from his having executed the subsequent deed of 1818. It follows then that the deeds executed by Mrs. Hopkins to her children were voluntary on her part, and binding. The Chancellor has so decided, and so far as that question is concerned the appeal must be dismissed.
2. The second question arising out of this state of the facts, is whether supposing the deeds voluntary, on the part of Mrs. Hopkins, they are a fraud on the marital rights of the complainant, and therefore void.
The fortune of the intended wife is most frequently a weighty consideration and a strong inducement to the marriage contract, and the happiness of both the parties may, in a good degree depend on the observance of good faith, with respect tó it; and the genereral rule, very clearly, is that if pending a treaty of marriage, the intended wife makes a secret voluntary disposition of her property, and the marriage is a fraud upon the martial rights of the husband, and void. In Hunt & Matthews, 1 Vern. 408, a widow before she married again, disposed of the greater part of her estate, for the benefit of her children by her first mar *8 riage, and it became a question whether that disposition was void as to second husband, who had married her a* short time after; and it was held that it was not — the Court deeming it a conscientious thing in the wife to provide for such children, before she placed herself in the power of a second husband. And I remember that that rule is stated in the case of Jones v. Cole, brought up to this Court, from New-berry some time ago, but not yet reported, when the husband also had notice. But Roper, in his treatise on the laws arising from the relation of husband and wife (page 162) questions, and I think with much show of reasoning, the propriety of allowing this case, as an exception, to the general rule laid down in Strathmore v. Bowes, 1 Ves. Jun. 28, & Havard v. Hooker, 2 Ch. Rep. 81. The objection he remarks, is not, to the object of the settlement. The fault is, the fraud committed by it, on the second husband, and it would seem that, as to him the effect must be precisely the same, whether the disposition was in favor of the children or others. This case however steers clear of this difficulty. There is in the first place no proof that the the treaty of marriage was on foot at the time these deeds were executed. They are dated on the 19th of December, 1818, and the marriage was not solemnized until some time in the month of February following ; a period too long necessarily to authorize the inference that the treaty of marriage was then pending. But a conclusive circumstance is that the complainant had notice of these deeds, before his marriage. The witness Lyles, told him of the deeds — Emanuel Allen informed him that the negroes were generally considered as the property of the defendant Ferdinand Hopkins, Son. ; and in the Chancellor’s decree of 1825, it is said he approved and applauded it. If the fortune was the inducement to seek the marriage, this would have furnished a reasonable ground to have broken it off, and he will not be permitted now to complain of a circumstance which was known to him before he was committed.
3. At the time of the intermarriage between the complainant and Mrs. Hopkins, she had possession of two negroes, Daniel and Betty, which the complainant claims, in virtue of his marital rights,—the defendants on the contrary claim them as part of the estate of George W. Hopkins.
The circumstances connected with these claims, appear to me to admit of no doubt. .The evidence of Thomas Booker, *James Sanders, Daniel Glenn, Wm. Wright, William Hughes, Mrs. Head, Bennett Humphries, Loften Nunn, and Mrs. Nunn, make out beyond all contradiction, that Bird Booker, the father of Mrs Hopkins, gave to her, negro Will, during the lifetime of her first husband, George W. Hopkins, with an understanding, that he would have the right to take him back again, if he thought proper, on paying the value for him, or substituting other property in his place. Subsequently to the death of George W. Hopkins, and before the marriage of his widow, Bird Booker did take Will back, and put in his place a negro called Phill, who on being chastised a few days after, by the overseer, ran away and returned to Mr. Booker. About four years after, Mr. Booker sent to Mrs. Hopkins, Daniel and Betty, the negroes in controversy. Daniel was of less value than Will, and the witness says, that the additional negro Betty, was sent for the purpose of supplying this difference in value, and as a compensation for the loss of the services of Will, during the time he had him. The circumstances *9 relied upon by the complainant, to show that Daniel and Betty was a gift directly to Mrs. Hopkins, by her father, are 1st., that neither they nor Will, were included in thé inventory of George W. Hopkins’ estate; and 2dly, that these negroes are given to her, by the will and testament of her said father, dated on October, 1818, and long after she had them in possession.
If' as has been assumed, Bird Booker gave Will to Mrs. H., in the lifetime of her first husband, subject to the condition, that he should be restored upon his paying value, or substituting other property, the property in Will vested in Geo. W. H., subject to that condition, andMr. Booker was not at liberty to resume the property, without having first performed the condition — these rights devolved on the administrators of Geo. W. H. precisely to the same extent, and in the same condition as they existed in him, and no neglect, on the part of the administrators, to include Will in the inventory, nor the subsequent act of Mr. Booker, in disposing of the negroes substituted for Will, could vary them But these circumstances appear to me, to be reconcilable with the assumed state of facts. It was known that Mr. Booker had reserved the right to take back Will —probably his determination to do so, was known *at the time, and he was not, therefore, included in the inventory of Geo W. H. ’s estate ; improperly, I admit, but I can well conceive, that persons, intending to do what was right, might not well understand the character and the extent of his rights. Bird Booker had not made any formal transfer of the negroes, Daniel and Betty, and he might have thought it necessary to give them in his will, as confirmatory of what he had before done — a very common practice, and I cannot perceive any evil growing out of it. We are, therefore, of opinion, that Daniel and Betty must be regarded as part of the personal estate of Geo. W. H. and accounted for as such ; and the decree of the Circuit Court, in this respect, must be reversed
4. During the widowhood of Mrs. H., she purchased a tract of land situated in tJnion District, for $2,800, on a credit, and gave her note for payment. A part of this sum was paid by her, before her intermarriage with the complainant. During their coverture, the complainant himself paid, on account of this contract, the sum of $800, and subsequently to her death, $903 82, as appears by the Report of the Commissioner of July, 1831; and one question raised on the part of the defendant is, whether he is entitled to be reimbursed out of the lands, or her personal estate, for the sum paid by him during the coverture.
Mrs. Terry died entitled to a personal estate, not reduced to possession by the complainant during their coverture, and after her death he administered on it. It is not questioned, that in his account of this estate, he is entitled to be credited with the amount paid on this contract, subsequently to her death. He was not personally liable, (Roper 74) and of course it must be charged to her estate. But the claim to be reimbursed the amount paid by him during the coverture, is clearly untenable. The husband takes the wife cum onere ; and during the coverture, the debts contracted by the wife are the debts of the husband, and that, whether she brings a fortune with her or not. A common-place view of this question will put it in the clearest point of view. A woman indebted takes a husband ; the law makes him liable, and he pays them — who is *10 his debtor ? How will he exact payment of the wife ? She cannot be his debtor. On marriage, he is entitled to all her goods, *and an estate for her life, in her real estate. Her death cannot create a debt which, before, had no existence. This rule works, perhaps, somewhat harshly. A wife may owe large sums, and a corresponding estate may be in expectancy, which might not come in during her life, and it would seem a hardship that, if the husband paid the debts during the coverture, he should not be reimbursed. But it will be remembered that the husband takes the whole personal estate of the wife, and an estate for life, in her lands. In the treaty of marriage, circumspect persons look sometimes to the debtor and creditor sides of the account, and the apparent hardship vanishes when it is recollected that the act was voluntary.
5. It is contended, also, for the complainant, that he is entitled to compensation for raising the children.of G. W. Hopkins, and the young negroes belonging to the estate.
This claim refers principally to Mrs. Terry’s administration of the estate during her widowhood. Mrs. Terry had possession, and the management of the whole estate, real and personal. In the account stated by the Commissioner, she is charged only with the proceeds of the crops sent to market, and is credited with all disbursements made on account of the estate, without distinguishing for what particular object, or for whose individual use. She herself raised no account against the children, or charge for raising the young negroes. But it is now brought up, for the first time, by the complainant. The annual income from the estate did not greatly exceed the necessary expenditures; and it is evident that Mrs. Terry herself, supposed that as they were all subsisting in common, and were all entitled to an equal distribution of the estate, there could be no great inequality in their expenditures; and none appears, from the evidence. But if that were not so, the children alone would have a right to complain; — not the complainant, because he is credited with every dollar that was disbursed on account of the estate, and what more would he have. Is it that he is entitled to compensation for Mrs. Terry’s care and trouble in attending to her own children before he married her ? I will not do him the injustice to believe that was intended.
6. It is claimed, also, for the complainant, that Ferdinand *Hopkins, Sr., ought to have been charged with the amount of a note due by H. Head and J. Kennedy, say $274; — but on what ground is not stated. It does appear, however, that he received §30 92 from H. Head on account of this note, which-is not accounted for. The Commissioner concludes that this amount was paid to the widow, because he has paid over to her all other moneys received by him, and the necessities of the estate required all its means, and because the widow managed it exclusively. Knowing the parties as I do, if I were left to form a conjecture, I should certainly concur with the Commissioner. But we cannot proceed upon conjecture. — Ferdinand Hopkins did receive this amount, and unless he can account for the payment by proof, he is chargeable with it. But, if it is desired, I think that the subject ought to be considered as open for further proof, if it can be furnished ; and the Commissioner is ordered to re-examine this item, if further evidence shall be offered by Mr. Hopkins.
Eaves, for the plaintiff.
Williams, contra.
T. It is objected, also, that Ferdinand Hopkins, Jr., the son of Mrs. Terry, and one of the defendants, is not charged with $400 18j, received by him on account of the crops of 1816 and ’ll.
He was of full age, it appears from the Commissioner’s Report, when he received $260, part of the amount, and the principal objection, on his part, to his liability to account, appears to have been that the plaintiff had not in his bill prayed an account against him. That is true, but in his answer, this defendant prays an account from the complainant, of the administration of the estate of G-. W. Hopkins, by his mother, the complainant’s intestate; and this charge, if it be allowed, is pro tanto, a legitimate set off against that demand, and is a matter directly put in issue by his own answer. He is, therefore, bound to render the account. His infancy, when he received a part of the sum, is doubtless a protection as to that, but we will not anticipate that he will, or that he should, avail himself of it. In order, therefore, that all the facts may appear, we have concluded to refer it back to the Commissioner to examine and report freely upon the subject, and it is so ordered.
This view of the ease covers, I believe, all the questions *which have been raised by the motion on the part of the complainant, and embraces, also, all the grounds which have been specified by the defendant. And it is ordered and decreed that the decree of the Circuit Court be reformed according to the principles of this decree ; and that the Commissioner do state the accounts between the parties conformably thereto.
Martin, J., (sitting for Harper, J.,) concurred.
O’Neall, J.. having been of counsel for the defendant, gave no opinion.